PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1398

_____

UNITED STATES OF AMERICA

v.

QUINTRELL REYNOS,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. No. 2-09-cr-00618-002)
District Judge:  The Honorable Mitchell S. Goldberg

ARGUED JANUARY 10, 2012

BEFORE:  RENDELL, AMBRO, and
NYGAARD, *Circuit Judges*

(Filed :  May 22, 2012)

Megan S. Scheib, Esq. [Argued]
William J. Winning, Esq.
Cozen O'Connor
1900 Market Street, 3rd Floor
Philadelphia, PA 19103
    *Counsel for Appellant*

Joseph T. Labrum, III, Esq.
Robert A. Zauzmer, Esq. [Argued]
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
    *Counsel for Appellee*

––––––––––

OPINION OF THE COURT

––––––––––

NYGAARD, *Circuit Judge*

This appeal asks us to determine whether the District Court erred by enhancing the Appellant's offense level with a 4-level increase for an abduction. Although the issue is simply stated, the question of what constitutes an abduction within the meaning of U.S.S.G. § 2B3.1(b)(4)(A) has not been addressed by this Court until today.

I.

It was nearly midnight on April 18, 2009, when Appellant Quintrell Reynos and another individual robbed Ed's Pizza House in Philadelphia. Reynos was charged with Hobbs Act robbery and conspiracy to commit Hobbs Act

robbery, violations of 18 U.S.C. § 1951(a) and 2 (Counts One and Two) and with using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Three).[1] Reynos pleaded guilty to all three counts. At the plea hearing, the Government set forth the following factual background:

> Three witnesses were working at the pizza shop at the time of the robbery: Juan Gutierrez, Jose Canabill, and Julian Costeo. Gutierrez[2] was moving from the cash register to the pizza oven shortly before midnight when he observed the other employees backing-up in the direction of the back door. Believing a robbery was about to take place, Gutierrez and his fellow employees went to the back of the shop and locked themselves into the bathroom. One of the workers called the police from a cell phone.

---

[1] The Hobbs Act, codified at 18 U.S.C. § 1951, is a federal law prohibiting actual or attempted robbery or extortion that affects interstate or foreign commerce. Section 1951 also proscribes conspiracy to commit such a robbery or extortion without reference to the conspiracy statute at 18 U.S.C. § 371.
[2] We correct the phonetic misspelling of Gutierrez's name in the transcript here, and throughout our opinion.

Thereafter, the black males [sic] started to kick in the bathroom door, gained entry and said he needed one of them to open up the cash register or I'll start shooting. [Employee] Gutierrez saw the male who he later identified as a person who frequented the store regularly and he was later identified as Quintrell Reynos and it was Reynos who brandished what Gutierrez has described as a large, black automatic pistol.

At Reynos' demand, Gutierrez opened the cash register. Reynos took the money in the cash register and then stated "do you have any more money? Reynos started to search Gutierrez. Reynos then said, "Jose, where's the money?" It was at this point that Gutierrez recognized Reynos from seeing him in the store many times before and serving him food. Reynos asked for keys to the back door. Gutierrez explained that the key was in the back. Reynos then moved toward the back of the shop and at that point, all of the employees ran out the front door of the shop.

Reynos did not challenge these facts.

A presentence report was prepared. Pursuant to the Sentencing Guidelines, Reynos' base offense level was set at 20. The PSR recommended a 4-point upward adjustment in the offense level for abducting the pizza shop employees, pursuant to U.S.S.G. § 2B3.1(b)(4)(A). The PSR also recommended a 3-point reduction in the offense level, resulting in a total base offense level of 21. Reynos' criminal history category was originally put at a Category III, but was later reduced to a Category I.

Thus, the advisory sentencing range was identified as between 37 and 46 months incarceration. A mandatory consecutive sentence of 120 months was also called for as a result of Reynos' violation of 18 U.S.C. § 924(c).

The District Court, over Reynos' objection, agreed with the PSR and enhanced his offense level by 4 points, finding his actions to have constituted an abduction under the Guidelines. After considering all of the appropriate sentencing factors, the District Court imposed a sentence of 157-months imprisonment. Reynos now appeals, arguing that the District Court procedurally erred by enhancing his offense level for abducting the pizza shop employees.

II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have appellate jurisdiction under 28 U.S.C. § 1291. "When reviewing the sentencing decisions of the district courts, we exercise plenary review over legal questions about the meaning of the [S]entencing [G]uidelines,

but apply the deferential clearly erroneous standard to factual determinations underlying their application." *United States v. Collado*, 975 F.2d 985, 990 (3d Cir.1992). We assess whether a district court committed a "significant procedural error" and whether the ultimate sentence was substantially reasonable. *United States v. Larkin*, 629 F.3d 177, 181 (3d Cir. 2010).

Here, Reynos challenges only the procedural reasonableness of his sentence. Because he does not challenge any other part of the District Court's sentencing calculation, or take issue with the substantive reasonableness of the District Court's decision, Reynos has waived any challenge on those grounds. *See United States v. Negroni*, 638 F.3d 434, 440 n.4 (3d Cir. 2011). Reynos alleges two procedural errors: 1) that the District Court improperly applied the abduction enhancement to his sentence, and 2) that the District Court engaged in "double counting" by enhancing Reynos' sentencing for abduction where the use of the handgun actually served as the basis of his conviction under 18 U.S.C. § 924(c).

III.

A.

We begin with the abduction enhancement. The pre-sentence report recommended an upward adjustment for abduction based on Reynos' "kick[ing] open the bathroom door where the restaurant employees sought refuge, abduct[ing] them at gunpoint, and forc[ing] them to the cash register area." Section 2B3.1(b)(4)(A) provides for a four-level increase in the base offense level for robbery "if any person was abducted to facilitate commission of the offense

6

or to facilitate escape."  "Abducted" means that a victim was "forced to accompany an offender to a different location.  For example, a bank robber's forcing a bank teller from the bank into a getaway car could constitute an abduction."  § 1B1.1, comment. (n.1(a)).

From this Guideline, we distill three predicates that must be met before the abduction enhancement can be applied.  First, the robbery victims must be forced to move from their original position; such force being sufficient to permit a reasonable person an inference that he or she is not at liberty to refuse.  Second, the victims must accompany the offender to that new location.  Third, the relocation of the robbery victims must have been to further either the commission of the crime or the offender's escape.[3]  Whether

---

[3]Our dissenting colleague emphasizes the need to find that the defendant forcibly moved the victim "in a manner and/or for a reason that the abduction enhancement was specifically designed to prevent."  In addition to the examples of such reasons the dissent mentions, § 2B3.1(4)(A) makes clear that forcing movement to facilitate commission of the crime is a circumstance the enhancement was specifically designed to prevent.  Thus, even if we were to agree with our colleague that this additional requirement exists, we would find that it is met in this case, where Reynos kicked in a locked bathroom door and threatened the store employees with a gun before forcing at least one of them to accompany him to the cash register to commit the offense.  We find no support in the Guidelines, the accompanying commentary, or the caselaw for our colleague's suggestion that cases involving forcible movement to facilitate the commission of the offense should be treated differently than cases involving such movement to

or not the Government has established these predicates would, of course, be reviewed for plain error, with the degree of distance or definition of location, entrusted as it must be, to the sound discretion of the District Court.

Reynos attacks the addition of this enhancement to his sentence. He argues three distinct points: first, that the record is devoid of evidence proving he used "force" against the pizza shop employees; second, that the record is silent on whether the employees accompanied him from the bathroom to the cash register; and third, that moving from the bathroom to the cash register is a not a change of location.

1. Use of Force

We start with the enhancement's requirement of a use of force. Reynos argues that nothing in the record indicates he used actual force against any pizza shop employee. No victim, he argues, was "goaded, forced, dragged or shoved from the bathroom door to the cash register." True enough. No one was "goaded" into leaving the bathroom. And, we do not know whether any actual physical force—such as shoving or dragging—was exerted on the victims. The record's silence on the exertion of any physical force is of no moment, however.

Nothing within the plain meaning of the abduction enhancement's use of the term 'force' confines its meaning solely to physical force. *See, e.g., United States v. Cunningham*, 201 F.3d 20, 28 (1st Cir. 2000). As the Court in

---

facilitate the offender's escape, or that such cases require proof of an additional, "aggravating circumstance."

8

*Cunningham* noted, the term "force" connotes compelling someone "by physical, moral or intellectual means" or "to impose" or "to win one's way." *Id*. (citing Webster's Seventh New Collegiate Dictionary 326 (1970)). Furthermore, the abduction enhancement's intention—at least in part—is to protect victims against additional harm that may come to them by virtue of their isolation. *United States v. Whooten*, 279 F.3d 58, 61 (1st Cir. 2002). The enhancement applies, therefore, whether the abduction involved physical force or just the threat of such an assault. *Id*.

We will not, therefore, limit the application of the abduction enhancement to only those scenarios that include the exertion of actual physical force. We agree with those courts that have found, as a matter of policy that an abduction achieved through threat, fear and/or intimidation, "carries the same dangerous consequences as an abduction accomplished by the use of physical force." *Cunningham*, 201 F.3d at 28. In both instances, the offender is able to isolate his or her victims, thereby increasing the chance that they will be harmed. *Id*. (quoting *United States v. Saknikent*, 30 F.3d 1012, 1013-14 (8th Cir. 1994)). In *Cunningham, supra,* the Court of Appeals for the First Circuit observed that the abduction enhancement, at least in part, was designed to protect victims from isolation, and thus applies whether the abduction is carried out by threat, intimidation or by physical violence. 201 F.3d at 28. Likewise, in *Saknikent,* the Court of Appeals for the Eighth Circuit found that "the abduction enhancement requires only that force necessary to overcome the particular victim's will." 30 F.3d at 1014.

Here, we note first that the victims had fled to a place of relative safety—a small bathroom, behind a locked door—

9

once the robbery commenced. Then, after Reynos forced open the bathroom door, the victims pointedly saw him 'brandish' a large, black automatic pistol. The Guidelines define "brandishing" as meaning "all or part of the weapon displayed, or the presence of the weapon was otherwise made known to another person *in order to intimidate that person*." *See* U.S.S.G. § 1B1.1, comment. (n.1(C)) (emphasis added). We have no hesitation in concluding that the brandishing of a weapon is a use of force for purposes of the abduction enhancement. Reynos wielded a lethal weapon in order to intimidate the victims by threatening to shoot them. This was an intimidating use of force designed to compel the victims to assist Reynos by opening the cash register. There is sufficient evidence on this record to support the conclusion that Reynos exerted force against the victims.

2.    Accompaniment

The abduction enhancement requires that the robbery victims accompany the offender to a new location. § 1B1.1, comment. (n.1(a)). Reynos argues that no evidence exists in the record to suggest that the pizza shop employees accompanied him to the cash register. At oral argument, the Government conceded that the record merely points to evidence that the pizza shop employees walked with Reynos from the bathroom to the cash register area.    But, the Government argues, when looking at the facts in their totality, it was not erroneous for the District Court to find that the victims accompanied Reynos to the cash register, a factual determination that we review for clear error. *See United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003).

Here, the facts reveal that, after kicking-in the bathroom door, Reynos demanded that the victims open the cash register for him or he would "start shooting." At this point, all three employees and Reynos were together at the bathroom. The next event in the timeline finds pizza shop employee Gutierrez with Reynos at the cash register. We know they are there because, as Reynos is taking the money from the cash drawer, he asks Gutierrez if there is any other cash in the shop. Reynos also physically searches Gutierrez at this point, an action Reynos could not have undertaken had Gutierrez not accompanied him to the cash drawer. When Reynos eventually retreated to the back of the shop, the employees fled out the front of the store. From these uncontested facts, we can easily surmise that the employees and Reynos were together at the cash register whereas before they were together at the bathroom. It defies common sense to argue that the employees did not accompany Reynos from the bathroom to the cash register. We therefore have little trouble concluding from this record that the victims accompanied Reynos from the bathroom to the cash register.

Furthermore, the record conclusively establishes that Reynos forced the victims to accompany him to facilitate the robbery of the cash register. *See, e.g., United States v. Hawkins*, 87 F.3d 722, 728 (5th Cir. 1996) (accompaniment made in connection with a getaway). The record clearly indicates that Reynos ordered the victims to accompany him to the cash register and that at least one victim, Gutierrez, opened the register for Reynos. Reynos had no reason to come into contact with the victims, other than to force them to join him. Presumably, he could have committed his robbery offense alone, leaving the pizza shop employees locked in the bathroom. Because Reynos used force to move

11

the victims from the bathroom to the cash register and because the victims accompanied him there, the abduction enhancement was properly applied, unless the relocation from the bathroom area to the cash register site was not a change in location.

3.    Change in Location

At oral argument, the parties focused their disagreement on the previous question—whether the victims accompanied Reynos from the bathroom to the cash register. Their briefing, however, devotes the largest portion of argument to the question of whether moving from the bathroom area to the cash register amounted to a change in location. Reynos maintains that this movement—a distance of approximately thirty-four feet—did not amount to a change in location. He argues that the narrow confines of Ed's Pizza House constituted a singular site and no change in location could have occurred unless Reynos moved the victims outside of the facility. The Government disagrees.

We have not considered this question previously and we have no precedent interpreting what constitutes a change of location for purposes of the abduction enhancement. Other courts, however, have addressed the issue.

In *United States v. Hawkins*, 87 F.3d 722 (5th Cir. 1996), for example, the Court of Appeals for the Fifth Circuit held that the term "different location" should be interpreted flexibly, on a case-by-case basis. *Id.* at 726-28. At issue in *Hawkins* was whether moving a victim at gunpoint 40 or 50 feet across a parking lot to a van amounted to an abduction (the victim in *Hawkins* fled before being actively put into a

van). The Court of Appeals determined that the term "different location," as set out in the comments to § 1B1.1, is "flexible and thus susceptible of multiple interpretations, which are applied case by case to the particular facts under scrutiny, not mechanically based in the presence or absence of doorways, lot lines, thresholds and the like." *Id.* at 727-28; *see also United States v. Johnson*, 619 F.3d 469, 472 (5th Cir. 2010). The Court explained further:

> In ordinary parlance, "location" can refer to an outside building or parking lot, so that a miniscule movement, such as the crossing of a threshold separating interior and exterior of a building, would constitute movement to a different location.

> On the other hand, in ordinary parlance, "location" is frequently used in reference to a single point where a person is standing, or to one among several rooms in the same structure, or to different floors in the same building. In other words, while movement from outside to inside, or vice versa, or movement across a property line, might be factors giving support to a conclusion of "different locations," the absence of such facts does not bar such a conclusion.

13

*Id*.

The Court of Appeals for the Fourth Circuit has also followed *Hawkins'* approach. In *United States v. Osborne*, 514 F.3d at 389, 90 (4th Cir. 2008), the Court of Appeals for the Fourth Circuit affirmed the application of an abduction enhancement where the victims were forcibly moved from one section of a drugstore to another. In *Osborne*, the offender used force to move the victims from the secured pharmacy section of a Walgreens drugstore, across the retail floor, stopping at the front of the store. *Id*. at 389-90. Important to the *Osborne* Court was the fact that the pharmacy area and retail portion of the store were separated by a counter as well as a secure door which could be opened only by authorized personnel through the use of a digital keypad. *Id*. at 390. The *Osborne* court also deemed it important that the offender had moved the victims in order to facilitate his escape. *Id*.

We find the flexible approach outlined in the *Hawkins* and *Osborne* decisions to have considerable merit. The term 'location' connotes several things; hence, the necessity of a flexible definition. Certainly, two separate physical structures are two distinct locations. And, a location does not need to have a physical construct—a park or the beach can be a location just as a courthouse or church. No one could argue that moving from one of these physical structures or geographic locations to another is not a change in location. The term 'location,' however, is broad enough to encompass different points of reference within the constructs of a single building or geographic site. *See Osborne*, 514 F.3d at 389. A courthouse, for example, has numerous distinct locations within: a clerk's office, courtrooms, security offices and

14

judicial chambers are all separate and distinct locations within the same structure. Paring it down further, a judge's chambers in that same courthouse may have several locations: a reception area, judge's office, law clerk cubicles and file rooms, for example. Of course, the smaller the space, the more difficult it is to find a change in location. But, even then, the smallest of areas still may contain different locations: a judge's private office may have a location containing a desk and computer that is separate and distinct from a location containing a conference table and chairs. It is precisely because of the broad scope of the term 'location' that courts must use a highly flexible approach in finding one; an approach that recognizes that the abduction enhancement may properly be applied even though the victim remained within the confines of a single building. *Hawkins* at 728.

After thoroughly reviewing the facts before it, the District Court in this case found a change in location, determining:

> I think the Government says that it was 39 feet from the locked bathroom to the cash register. The defense says it was 34 feet. I don't know that it makes much of a difference. For the benefit of the doubt of the Defendant, I'll find that it was 34 feet, but when I originally looked at the picture of the pizzeria, it seemed that the bathroom and the cash register were in close proximity, but the video was very illuminating;

15

they're not. They're [sic], and I won't describe it perfectly, but you have to go down a couple different halls to get from one area of the bathroom which is far away from the register, so it's not a matter of one being right next to the other. We have, at least based on the Defense's version, 34 feet.

This finding was not erroneous. The record fully supports the District Court's determination. The District Court was quite thorough in making this finding. After the sentencing hearing, the Court recessed for a week in order to obtain additional details on the exact layout of Ed's Pizza House. During this recess, the parties submitted video documentation of the store as well as photographs and diagrams indicating the physical measurements of the store. By virtue of its locked door, separate walls and distance from the cash register, the District Court found the bathroom of the pizza shop to be a different location from the cash register area, a conclusion well within its considerable discretion.

"Unduly legalistic" and "punctilious" are words previously used to describe a less than flexible approach to finding a 'change in location' under the Guidelines' definition of enhancement. *See, e.g., Hawkins, 87 F.3d at 728*. We agree and will not disturb the District Court's finding.

4.      Facilitating the Offense

The record shows that Reynos, after kicking-in the bathroom door, reached in and unlocked it. He then forced

16

Gutierrez and the other victims, at gunpoint, to leave the bathroom and move with him to the cash register area. There, he forced Gutierrez to open the cash drawer, which Reynos then robbed. The abduction enhancement requires that the offender force the victims to accompany him in order to facilitate *either* the commission of the crime or the offender's escape. U.S.S.G. § 1B1.1 app. note 1(a); 2B3.1(4)(A). Reynos clearly did not abduct the victims here to facilitate his escape. After emptying the cash register, Reynos abandoned his victims and attempted to flee out the back door. The victims escaped through the front entrance. Instead, Reynos used Gutierrez to open the cash register, thereby facilitating his offense. These are adequate facts to find that Reynos forced the victims to move to a different location for purposes of facilitating the commission of the crime.

5.    Conclusion

Our review of the record leads us to conclude that Reynos abducted the pizza shop employees during the commission of the robbery. This is the type of case where the abduction enhancement is proper, even though the victims moved within a single structure. Reynos broke open the locked bathroom door where the employees had secured themselves, extricated the employees and forced them—at the point of a gun—to move more than thirty-feet to a new location, the cash register area of the store. Employee Gutierrez was then forced to open the cash drawer, thereby facilitating Reynos' crime. On these facts, the District Court did not err by applying the abduction enhancement to Reynos' sentence.

C.

17

Having determined that the abduction enhancement was proper, we turn to Reynos' argument that applying this enhancement amounted to "double counting." Improper double counting occurs when a district court imposes two or more upward adjustments within the same Guideline range, when both are premised on the same conduct. *See, e.g., United States v. Fisher*, 502 F.3d 293, 309 (3d Cir. 2007). Double-counting is prohibited by U.S.S.G. § 2K2.4, cmt. n. 4, which provides, "[if] a sentence under this Guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense." Reynos argues that improper double-counting occurred here because the District Court enhanced his offense level for abduction premised on the fact that he used a handgun—conduct already covered by Count Three of the indictment. That is to say, in sentencing Reynos to a ten year mandatory minimum for use of a handgun called for by 18 U.S.C. § 924(c), the District Court improperly took into account the fact of the abduction enhancement. We disagree.

First of all, abducting a person during the course of a robbery is not a "specific offense characteristic for possession, brandishing, use or discharge of an explosive or firearm." § 2K2.4. Instead, the District Court's enhancement addresses separate harm--the endangerment of the pizza shop workers by moving them to a different location in order to facilitate the commission of Reynos' offense. Here, even though the crime involves both an abduction and the use of a gun, separate provisions of the Guidelines are properly applied to capture the essence of Reynos' offenses.

18

Secondly, the application of the abduction enhancement in this case fits squarely into *Fisher, supra.* There, we held that "only when the Guidelines explicitly prohibit double counting will it be impermissible to raise a defendant's offense level under one provision when another offense Guideline already takes into account the same conduct." 502 F.3d at 309 (citing *United States v. Wong*, 3 F.3d 667, 670 (3d Cir. 1993)). *Fisher* involved a prosecution for possession of a firearm by a convicted felon, based on a situation where the defendant pointed a firearm at a police officer. There, we upheld both the enhancement for use of a firearm in connection with another felony offense and the additional enhancement for intent to cause bodily harm to a law enforcement officer. Although these enhancements stemmed from the same incident, we held that "[o]nly when the Guidelines explicitly prohibit double counting will it be impermissible to raise a defendant's offense level under one provision when another offense Guideline already takes into account the same conduct." *Id*. The enhancements in *Fisher* did not constitute double counting because the Guidelines permitted the application of both. One enhancement punished the use of a firearm while the other called for an enhancement based on the victim's status as a police officer. *Id*.

Enhancing Reynos' sentence was not double counting. The penalty for the robbery offense is set out in § 2B3.1 and the one for use of a firearm is found in § 2K2.4. And, the four-point increase in the offense level for the abduction offense is found in § 2B3.1(b)(4)(A). Reynos points to no explicit prohibitions here, so we find no improper double counting.

III.

The District Court has imposed a sentence that is procedurally correct. We will, therefore, affirm its judgment.

United States of America v. Quintrell Reynos,
No. 11-1398

---

AMBRO, <u>Circuit Judge</u>, dissenting.

Under the Sentencing Guidelines, an abduction occurs when "a victim was forced to accompany an offender to a different location." U.S.S.G. § 1B1.1, comment (n.1(A)). To illustrate this, commentary for the Guidelines states that "forcing a bank teller from the bank into a getaway car would constitute an abduction." *Id.* The Guidelines' example of forcibly taking someone from inside a bank to a getaway car outside the building stands in stark contrast to the case before us, where the bathroom and the cash register are separated by a distance of only 34 feet within an 803-square-foot pizza shop.

The analysis of what qualifies as an abduction, and what does not, is subtle and nuanced. Reasonable people can differ, and the side of the line I land is different than my colleagues. For the reasons given below, I respectfully dissent.

The beginning point for my colleagues is that the term "location" "is broad enough to encompass different points of reference within the constructs of a single building or geographic site." Maj. Op. at 14. I agree. For example, shopping malls, office buildings, and apartment complexes may be single structures, but no one would dispute that they have different points of reference within them (various retail stores, different companies' offices, and individual apartments), and hence have different locations.

However, as the majority opinion notes, "the smaller the space, the more difficult it is to find a change in location." *Id.* at 15. I also agree. But here my perspective parts with my colleagues. To me, if the building or geographic site is small enough, and/or the distance traveled is short enough, there is only one point of reference, and, in turn, only one location. While their contention that even "the smallest of areas still may contain different locations[,]" *id.*, is plausible in theory, in many situations involving a single small building or geographic site, and/or when only a short distance is traveled, it strains logic.

Such is the case with Ed's Pizza House. It is so small—803 square feet by my estimation of the 56' by 14'4" shop—that I believe it is only one point of reference and thus only one location. Many offices of senior persons in organizations are at least as big.

If a customer were standing near the bathroom door of Ed's Pizza House and asked where he was located, he would say he was at Ed's Pizza House. If this same customer were then to walk to the cash register (34 feet away from the bathroom door) and again asked where he was located, I have no doubt that he still would say he was at Ed's Pizza House. The short distance traveled within the same small shop leads me to conclude that there was not movement to a different location.

Contrast this with the example of a mall shopper who travels 34 feet across a walkway, leaving Store A and entering Store B. While the distance traveled is the same as that in this case, the points of reference are undoubtedly different in the shopping mall example. The shopper would first say he was at Store A and then say he was at Store B. As

2

such, the mall shopper did, in fact, move to a different location in the example. The same can be said for the apartment resident who walks across the hallway, leaving Apartment 1A and entering Apartment 1B. While the distance traveled is short (likely even less than 34 feet), his location certainly changed from one apartment to the other.

Consider also the example of a farmer in his cornfield. He could walk hundreds of yards, but, because each position in his cornfield is amorphous, his location does not change. He still is in his cornfield no matter where he is located.

Thus, while I agree with the majority that a "highly flexible approach," *id.*, should be employed when analyzing the "different location" issue, these examples underscore the principle that, when only one building or geographic site is involved (especially a small building or site), and/or when only a short distance is traveled, there is a greater need for the crossing of some line of demarcation—a doorway, lot line, threshold, *etc.*—to find that there was movement to a different location. To hold otherwise would "virtually ensure" that any movement at all would result in an abduction enhancement. *See United States v. Eubanks*, 593 F.3d 645, 654 (7th Cir. 2010) (holding, among other things, that abduction enhancement was inappropriate where an armed robber forced a store employee to the back room to retrieve a surveillance video).

I readily acknowledge that, even when only one building or geographic site is involved and/or when the distance traveled is not great, the abduction enhancement rightly can be applied to a defendant who forcibly moves a victim in a manner and/or for a reason that the abduction enhancement was specifically designed to prevent, such as

3

when the defendant isolated the victim, used the victim as a hostage or human shield, or forced the victim to accompany him during his getaway. *See United States v. Osborne*, 514 F.3d 377, 390-91 (4th Cir. 2008) (holding that abduction enhancement was applicable where defendant forced Walgreens employees at knifepoint from the pharmacy section, located in the back of the store, to the front door of the building; relying heavily on fact that the defendant forced the victims to accompany him so he could "keep[ ] [the] victims close by as readily accessible hostages"); *United States v. Whooten*, 279 F.3d 58, 61 (1st Cir. 2000) (observing that "the abduction enhancement is intended, at least in part, to protect victims against additional harm that may result from the victim's isolation"); *United States v. Hawkins*, 87 F.3d 722, 728 (5th Cir. 1996) (per curiam) (holding that abduction enhancement was applicable where victims were dragged and forced at gunpoint from a pickup truck to a van that was 40-50 feet away within the same parking lot largely because the movement "was made in connection with a getaway"). In such a situation, the aggravated nature of the defendant's forcible movement of the victim likely tips the scale in favor of finding that there was movement to a different location despite there having been only one building or site involved and/or a short distance traveled.

Absent an aggravating circumstance, however, there is little to support the finding of a different location when only one small building or site is involved, and/or when only a short distance is traveled, and there is no line of demarcation. This is because "transporting victims from one room to another is simply not enough for abduction" absent an aggravating circumstance (such as those described above) that is "'plainly targeted by the abduction enhancement.'"

4

*Eubanks*, 593 F.3d at 653-54 (quoting *Osborne*, 514 F.3d at 390). "To find otherwise would virtually ensure that any movement of a victim from one room to another within the same building, without any other aggravating circumstances, would result in an abduction enhancement." *Id.* at 654. Application of the abduction enhancement thus would be inappropriate in such a situation.

There is no aggravating circumstance here. Quintrell Reynos did not isolate one victim from the rest, he did not use any of them as a hostage, nor did he force any of them to accompany him in his getaway. In fact, after Reynos obtained the money from the cash register and from Juan Gutierrez's person, Reynos left the pizza shop through its back door while Gutierrez and the two other employees went out the front door. It is difficult for me to see how the abduction enhancement is appropriate when the supposed abductor and his abductees left the building separately and through different doors.

It is true that Reynos forcibly moved the pizza shop employees from the bathroom to the cash register in order to facilitate the commission of a crime—the robbery. However, this alone is insufficient to subject Reynos to the abduction enhancement. To put into play that enhancement, whether for an escape or to facilitate a crime, there must be more than one location involved. As explained above, I believe here only one location was involved, as all of the movement occurred within a single, and small, building and only a short distance was traveled.

Accordingly, because I believe that the bathroom and cash register within the small pizza shop are not different locations, and because no aggravating circumstance exists, I would hold that the abduction enhancement does not apply to this case.

While I believe that the four-level abduction enhancement under § 2B3.1(b)(4)(A) should not be applied to Reynos' sentence, I am skeptical that his term of imprisonment would be shorter in this case. Reynos' conduct appears clearly to warrant the two-level physical restraint enhancement under § 2B3.1(b)(4)(B), and that enhancement certainly would have been applied to his sentence had the District Court not applied the abduction enhancement. As noted below, the mere two-level decrease in total offense level would have reduced the sentence range by only seven to nine months, with the low end of the sentence range for the higher offense level overlapping with the high end of the sentence range for the lower offense level. The sentencing judge thus could have imposed the exact term of imprisonment on Reynos had the restraint enhancement been applied instead of the abduction enhancement.

Section 2B3.1(b)(4)(B) of the Sentencing Guidelines provides for a two-level increase "if any person was physically restrained to facilitate commission of the offense." U.S.S.G. § 2B3.1(b)(4)(B). "Physically restrained" means "the forcible restraint of the victim such as by being tied, bound or locked up." U.S.S.G. § 1B1.1, comment (n.1(K)). The qualifying phrase "such as" in this definition indicates that the words "tied, bound, or locked up" are listed by way of example rather than limitation. *United States v. Carter*, 410 F.3d 942, 954 (7th Cir. 2005). Accordingly, physical restraint "is not limited to the examples listed in the

6

guidelines." *United States v. Copenhaver*, 185 F.3d 178, 180 (3d Cir. 1999). Moreover, "[f]orce is not limited to physical force, but may also encompass the operation of circumstances that permit no alternative to compliance." *Carter*, 410 F.3d at 954 (citation and internal quotation marks omitted).

In our case, Gutierrez and his two co-workers had no alternative but to comply with Reynos' demands. *See id.* (holding that restraint enhancement was applicable where the defendant forced a bank teller at gunpoint from the bank vault to her cash drawer against her will, explaining that, "with [the defendant's] gun pointed at her from only inches away, [the bank teller] had no alternative but to comply with his instructions to move"). Reynos' conduct "was thus more culpable than a robber who does not forcibly restrain a victim to facilitate his offense." *Id.* As such, I believe that the two-level physical restraint sentence enhancement would be appropriate.

Consequently, it appears that the District Court still could have sentenced Reynos to 157 months' imprisonment. He was subject to a mandatory consecutive 10-year prison sentence under 18 U.S.C. § 924(c) for discharging a firearm during the robbery (he fired his handgun several times in an effort to break the lock on the back door of the pizza shop while attempting to flee). In addition, there is a base offense level of 20 for robbery under 18 U.S.C. § 1951. U.S.S.G. § 2B3.1. Applying the two-level restraint enhancement would mean an offense level of 22 (as opposed to 24 if the four-level abduction enhancement were used). With a three-level stipulated downward adjustment for acceptance of responsibility, the total offense level becomes 19 (as opposed to 21 if the abduction enhancement were applied). Even using Criminal History Category I (the lowest category), the

7

Guidelines' range for imprisonment for an offense level of 19 is 30 to 37 months, while the range is 37 to 46 months for offense level 21.  When this term is added to the 10-year mandatory consecutive prison sentence, the range for Reynos' sentence was 150 to 157 months' imprisonment.  Thus, Reynos still could have been sentenced to 157 months' imprisonment even using the restraint enhancement instead of the abduction enhancement.

\*  \*  \*  \*  \*

With this context, I respectfully dissent but doubt that the net effect, even were my lack-of-abduction view to prevail, results in a reduction in sentence.